UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHARESTATES, INC.,

Plaintiff,

-against-

HARI MADDALI and COPPER BRICKS LLC,

Defendants.

HARI MADDALI and COPPER BRICKS LLC,

Counterclaim Plaintiff,

-against-

SHARESTATES, INC.,

Counterclaim Defendant,

-and-

ALLEN SHAYANFEKR,

Third-Party Defendant.

**MEMORANDUM & ORDER**
2:24-cv-812-GRB-ST

**TISCIONE, United States Magistrate Judge:**

Sharestates sued Hari Maddali and Copper Bricks alleging breach of contract from an employment dispute. Maddali and Copper Bricks filed counter claims, alleging Sharestates failed to pay outstanding invoices and past due salary. Now Copper Bricks and Maddali allege Sharestates representatives—Amy Doshi and Radni Davoodi—coerced witnesses in India for favorable affidavits. Now before this Court is Maddali and Copper Bricks' Motion to Amend seeking to add Doshi and Davoodi as parties, and bring claims for account stated, tortious interference, and abuse of process.

Because the amendments are not prejudicial and their inclusion would expedite resolution of the entire controversy, the motion is GRANTED.

## BACKGROUND

In giving background, this Court refers to the Complaint ("Compl."), ECF No. 2, Answer ("Ans."), ECF No. 11, and Proposed Amended Answer/Third-Party Complaint ("Am. Ans."), ECF No. 132-3.[1]

Sharestates is a New York-based real estate lender. Compl. ¶ 1; Ans. ¶ 49. Allen Shayanfekr ("Shayanfekr") is Sharestates' CEO. Ans. ¶ 50. Amy Doshi ("Doshi") was Sharestates' General Counsel. Am. Ans. ¶ 55 – 56. Radni Davoodi ("Davoodi") is Sharestates' Chief Compliance Officer. *Id*. ¶¶ 53 – 54.

Hari Maddali ("Maddali") worked for Sharestates from 2016 through his resignation in 2023. Ans. ¶ 69; Compl. ¶¶ 6 – 9. At some point, Maddali became Sharestates' Chief Technology Officer, but the parties dispute whether that role began in 2016 or 2019. Compl. ¶ 6; Ans. ¶ 69.

As CTO, Maddali oversaw Sharestates' technology and deal trading platform. Ans. ¶¶ 56 – 57. Maddali was also responsible for hiring and paying overseas technology consultants, most of whom were based in India. Compl. ¶¶ 8, 12 – 14; Ans. ¶¶ 56 – 61.

In 2016, Maddali founded Copper Bricks—a technology consulting firm. Ans. ¶¶ 60 – 61.[2] Sharestates alleges Copper Bricks was formed solely to hire and pay Sharestates' overseas consultants. Compl. ¶ 12. Maddali contends he founded Copper Bricks more broadly to provide "technology and management consulting services to corporate clients in the U.S. and overseas." Ans. ¶ 60.

The crux of Sharestates' Complaint is that Maddali and Copper Bricks inflated invoices for overseas consulting fees, embezzling millions of dollars. Compl. ¶¶ 14 – 18. Sharestates sent

---

[1] Sharestates filed its complaint in Nassau County Supreme Court in December 2023. It was removed to Federal Cout in February 2024. *See* Notice of Removal, ECF No. 1.

[2] Where appropriate, the Court will refer to Maddali and Copper Bricks collectively as Copper Bricks.

Copper Bricks $8,547,091 and discovered the amounts invoiced "were a fraction of the amounts billed[.]" *Id*. ¶ 17. For example, on one occasion Copper Bricks invoiced Sharestates $199,700 for $27,300 of work. *Id*. ¶ 18.

Sharestates brought causes of action for fraud, breach of contract, breach of fiduciary duty, and unjust enrichment against Copper Bricks and Maddali. *Id*. ¶¶ 24 – 40.

On February 16, 2024, Copper Bricks filed an Answer asserting counterclaims. Maddali alleges he was initially hired by Sharestates as a technology consultant in 2015 and was tasked with hiring additional consultants. *Id*. ¶¶ 57 – 59. But notably, Shayanfekr was involved with hiring consultants and personally oversaw costs "at every stage for each new hire." *Id*. ¶ 61.

According to Maddali, the Parties had an agreed upon process for paying consultants: "[e]ach consultant was paid an agreed upon flat monthly fee. All consultants prepared a monthly invoice for their respective monthly fee. The individual monthly invoices were then consolidated, listing the totals of each consultant for that month. Copper Bricks submitted that consolidated invoice to Sharestates, without any mark-up." *Id*. ¶ 63.

The information was then uploaded to a shared platform—the Box Account—and reviewed on a weekly basis by Shayanfekr and Davoodi. *Id*. ¶ 64. Copper Bricks would pay the consultants then Sharestates would reimburse. *Id*. ¶ 65. Maddali alleges "Sharestates and Shayanfekr were aware of and approved this arrangement." *Id*.

In March 2017, Maddali's compensation was altered from an hourly rate to a monthly fee at Sharestates' request. *Id*. ¶ 66. Maddali also received 2% equity in Sharestates. *Id*.

In 2019, Shayanfekr asked Maddali to formally join Sharestates as an employee. *Id*. ¶ 68. Maddali, concerned that managing Copper Bricks while employed by Sharestates would be a conflict of interest, suggested executing a separate agreement between Copper Bricks and

Sharestates. *Id*. Shayanfekr assured Maddali no conflict would arise, and no written agreement was necessary. *Id*. Maddali formally joined Sharestates in December 2019 as CTO for a $325,000 salary. *Id*. ¶ 69. He retained 2% equity when hired but was required to sell 1% during Series A funding receiving approximately $600,000. *Id*. ¶ 70.

During his tenure as CTO, Maddali and Copper Bricks built Sharestates' deal trading platform. *Id*. ¶ 74. In 2022, Shayanfekr claimed Sharestates was losing business due to interest rate hikes and terminated consultants without paying for delivered work. *Id*. ¶ 75. Although in many cases, Copper Bricks already paid the consultants and Sharestates did not reimburse. *Id*.

From January to June 2022 Sharestates failed to pay Copper Bricks $1,445,624. *Id*. ¶ 76. The Parties negotiated a payment plan where Sharestates paid 50% of the outstanding balance in July 2022 and agreed to pay the remaining by December 2022 *Id*. ¶ 77. Sharestates, however, failed to pay the remaining 50%. *Id*.

In December 2022, Shayanfekr informed Maddali Sharestates planned to retain a new consultant agency owned by Sam Kaddah and would end its relationship with Copper Bricks March 2023. *Id*. ¶ 79. Copper Bricks stayed on for several months to train the new team. *Id*.

Maddali alleges Sharestates and Shayanfekr planned to avoid paying Copper Bricks and poached its consultants through the new agency. *Id* ¶ 80. But in April 2023, Sam Kaddah's relationship with Sharestates ended, and Shayanfekr requested Copper Bricks remain and help Sharestates until a planned data center migration was completed. *Id*. ¶ 81. Shayanfekr again promised to pay its outstanding balance with Copper Bricks. *Id*. Maddali agreed, but Sharestates—again—failed to fully pay the remaining balance. *Id*. ¶ 86.

In September 2023, Sharestates hired a new technology consultant team and again informed Copper Bricks of its intent to discontinue services. *Id*. ¶ 84. Once again, Maddali and

Copper Bricks provided the necessary knowledge transfer to the new team from September – November 2023. *Id.* ¶¶ 84 – 85. Sharestates, however, failed to pay Copper Bricks during this period, adding $133,900 to its unpaid invoices. *Id.* ¶ 87.

Copper Bricks further alleges Sharestates and Shayanfekr withheld $262,018.54 of his salary from 2020 – 2023. *Id.* ¶ 89.

In December 2023, Maddali spoke with Davoodi. *Id.* ¶ 92. Maddali states Davoodi took an unexpected accusatory tone for the first time and refused to pay his remaining salary and outstanding balance with Copper Bricks. *Id.* Maddali resigned and Sharestates' suit followed.

Maddali and Copper Bricks brought counterclaims for breach of contract, unjust enrichment, fraud, and violations of New York Labor Law against Sharestates and Shayanfekr. *Id.* ¶¶ 94 – 124.

As will be discussed in greater detail, Copper Bricks now claims Sharestates' representatives—namely Doshi and Davoodi—coerced potential witnesses in India for favorable affidavits in this matter. In the immediate motion, Copper Bricks seeks to add claims for account stated, abuse of process, and tortious interference, and add Doshi and Davoodi as Third-Party Defendants. *See generally* Motion to Amend, ECF No. 132.

## **LEGAL STANDARD**

Courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *Coniglio v. Cucuzza,* 345 F.R.D. 372, 377 (E.D.N.Y. 2024) (citing *Amaya v. Roadhouse Brick Oven Pizza, Inc.*, 285 F.R.D. 251, 253 (E.D.N.Y. 2012) (holding leave to amend is entrusted to the court's discretion)). Doing so "encourages courts to determine claims 'on the merits' rather than disposing of claims or defenses based on 'mere technicalities.' " *Exec. Trim Constr., Inc. v.*

*Gross*, 525 F. Supp. 3d 357, 366 (N.D.N.Y. 2021) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000)).

"Leave to amend, though liberally granted, may properly be denied for: undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (citation and quotations omitted).

"In general, district courts should not deny leave [to amend] unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000). "[T]he party opposing the amendment has the burden of establishing that leave to amend would be unduly prejudicial or futile." *Pilkington N. Am., Inc v. Mitsui Sumitomo Ins. Co. of Am.*, 2021 WL 4991422, *5 (S.D.N.Y. Oct. 27, 2021) (citations omitted). Accordingly, the "party opposing a motion to amend bears the burden of establishing that the amendment should be denied." *Hussain v. Burton & Doyle of Great Neck LLC*, 2015 WL 13227997, *2 (E.D.N.Y. Sept. 29, 2015), *report and recommendation adopted*, 2016 WL 8711393 (E.D.N.Y. Feb. 26, 2016); *see also United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 567 F. Supp. 3d 429, 438 (S.D.N.Y. 2021).

Motions to add parties "are afforded [the] 'same standard of liberality afforded to motions to amend pleadings.' " *Hussain*, 2015 WL 13227997 at *2 (citing *Addison v. Reitman Blacktop, Inc.*, 283 F.R.D. 74, 79 (E.D.N.Y. 2011)); *see* Fed. R. Civ. P. 21. There is "little practical difference" between motions to add parties and motions to amend, "since they both leave the decision whether to permit or deny an amendment to the district court's discretion." *Amaya*, 285 F.R.D. at 253.

Relevant here, where a party seeks to add claims for events occurring after the complaint was filed, "[the] motion is more properly classified as one for leave to serve a supplemental pleading under Fed. R. Civ. P. 15(d)." *Cummings-Fowler v. Suffolk Cnty. Cmty. Coll.*, 282 F.R.D. 292, 296 (E.D.N.Y. 2012). Rule 15(d) reads, in relevant part, "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15.

Rule 15(d) "reflects a liberal policy favoring a merit-based resolution of the entire controversy between the parties." *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008) (citation and quotations omitted). Notably, "the analysis under Rule 15(a) and Rule 15(d) is the same." *Cummings-Fowler*, 282 F.R.D. at 296; *see also M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 222 (E.D.N.Y. 2010). That is, whether the amendments are futile, made in bad faith, or prejudicial. *Id*.

## DISCUSSION

### I. New Causes of Action

Among Copper Bricks' new causes of action, account stated is the only occurring prior to the complaint. The abuse of process and tortious interference claims arise from post-complaint conduct. Controlling here, all three claims are intrinsically related to the ongoing dispute. This lends toward the conclusion the amendments are appropriate to support "a merit-based resolution of the entire controversy between the parties." *Katzman v. Sessions*, 156 F.R.D. 35, 39 (E.D.N.Y. 1994).

#### a. *Account Stated*

"An account stated is an agreement between parties to an account based on prior transactions between them with respect to the correctness of the account items and balance due."

*Yiwu Lizhisha Accessories Co. v. Jjamz, Inc.*, 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018) (citation and quotations omitted). An account stated has three elements: (1) an account was presented; (2) accepted; and (3) the debtor promised to pay the balance. *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009).

Copper Bricks alleges account stated for unpaid invoices, and all three elements are met. First, Copper Bricks presented accounts to Sharestates through the shared Box Account. Am. Ans. ¶186. Second, the accounts were reviewed and approved on a weekly basis by Sharestates. *Id*. ¶¶ 187 – 88. Third, Sharestates promised to pay the balance. *Id*. ¶ 190.

Nevertheless, Sharestates argues account stated is duplicative to Copper Bricks' breach of contract claim, and while there is certainly tension in the case law, recent precedent from the First Department allows both claims to survive.

In *Aronson Mayefsky & Sloan, LLP v. Praeger*, the First Department held "an account stated claim is an independent cause of action that is not duplicative of a claim for breach of contract." 228 A.D.3d 182, 183 (1st Dep't 2024). There, a law firm's client failed to pay legal fees. The firm sued for account stated and breach of the retainer agreement. The trial court granted summary judgment on account stated. On appeal, the client argued the trial court erred in failing to dismiss the claim as duplicative. The First Department affirmed the trial court, rectifying a historically incongruent precedent.

For example, *Vanpoy Corp., S.R.L. v. Soleil Chartered Bank*, 204 A.D.3d 486 (1st Dep't 2022) and *Dubinsky v. Levine*, 200 A.D.3d 574 (1st Dep't 2021) concluded breach of contract and account stated were duplicative. Conversely, *Unisol, Inc. v. Kidron*, 180 A.D.3d 570 (1st Dep't 2020) and *Skylink Travel, Inc. v. Jain Holdings LLC*, 189 A.D.3d 517 (1st Dep't 2020) permitted the causes of action to exist independently.

In *Praeger*, after discussing the above inconsistent holdings, the First Department held "that an account stated is an independent cause of action that can be asserted simultaneously with a breach of contract claim and that an account stated claim *should not be dismissed as duplicative* of a breach of contract claim." 228 A.D. 3d at 187 (emphasis added). The lynchpin of the First Department's rationale is that "[a]n account stated is an agreement, independent of the underlying agreement, regarding the amount due on past transactions." *Id.* at 185 (quoting *Duane Reade v. Cardinal Health, Inc.*, 21 A.D.3d 269 (1st Dep't 2005). I agree.

True, the *Praeger* court recognized a narrow exception, whereby courts should dismiss account stated where it is used "simply as another means to attempt to collect under a disputed contract." *Praeger*, 228 A.D.3d at 186 (2024). That is, "an account stated cannot be made an instrument to create liability when none otherwise exists but assumes the existence of some indebtedness between the parties[.]" *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 171 A.D.2d 479, 485 (1st Dep't 1991). In other words, account stated cannot be used to resurrect an otherwise defective breach of contract claim. But such is not the case here.

While Sharestates does well to cite judges of the Eastern District who have found the causes of action duplicative in the wake of *Praeger*—*see e.g., Prime Contractors Inc. v. APS Contractors Inc.*, 786 F. Supp. 3d 524, 546 (E.D.N.Y. 2025)—I find it inappropriate to foreclose the possibility of independent relief at this juncture.

Further, Sharestates is hard pressed to suggest permitting the amendment would be prejudicial as the majority of the facts supporting account stated exist in the original answer. Ans. ¶¶ 60 – 65, 73 – 78.

b. *Abuse of Process*

Copper Bricks' abuse of process claim is premised on the theory that Doshi and other Sharestates representatives offered several Indian consultants jobs and money in return for signing favorable affidavits and acting as witnesses in this case. Am. Ans. ¶¶ 140 – 49. When they refused, Sharestates allegedly threatened and eventually initiated criminal proceedings in India against Maddali, his family, and a non-cooperating witness. *Id.* ¶¶ 217 – 220. And these were not idle threats. As detailed in several affidavits, a police investigation ensued in Hyderabad, India. Witnesses were questioned by police and, allegedly, intimidated and bribed by Sharestates representatives. Am. Compl. ¶¶ 140 – 141; *see also* Exs. A – E of Am. Compl.

"Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984); *see also Gonzalez v. United States*, 2018 WL 1597384, at *14 (E.D.N.Y. Mar. 31, 2018).

The first element is satisfied, as Sharestates initiated criminal proceedings in India. Am. Ans. ¶ 218. In this Court's view, criminal investigations constitute regularly issued process. *See Klass v. Frazer*, 290 F. Supp. 2d 425, 426 (S.D.N.Y. 2003) (abuse of process is either civil or criminal); *see also Pinter v. City of New York*, 976 F. Supp. 2d 539, 570 (S.D.N.Y. 2013) (false arrest constitutes abuse of process in § 1983 claim).

Sharestates argues to the contrary by relying on a series of distinguishable cases. In *Manhattan Enter. Grp. LLC v. Higgins*, the defendant "filed and prosecuted a series of duplicative, frivolous, and malicious lawsuits[.]" 816 F. App'x 512, 514 (2d Cir. 2020). The Second Circuit refused to accept the plaintiff's novel theory that "a frivolous lawsuit is actionable as abuse of process." *Id*. Notably, the disputes there were civil—not criminal.

Sharestates also cites *Curiano*. But there the Court of Appeals held there was no abuse of process where the defendants had an ongoing libel suit against the plaintiff and "the only process issued . . . was a summons, the process necessary to obtain jurisdiction and begin the lawsuit[.]" *Curiano*, 63 N.Y.2d at 116. Again, this case was at the preliminary stages of civil litigation and unrelated to criminal investigations.

The only case Sharestates cites pertaining to criminal investigations is *Julian J. Studley, Inc. v. Lefrak*, 41 N.Y.2d 881 (1977). There, unlike here, the only process "consisted of an affidavit sent by [the defendant] to the Department of State alleging misdeeds by [the plaintiff] and merely requesting that the department take whatever steps it deemed appropriate." *Id*. at 884. Such is a far cry from the case at bar where Sharestates initiated criminal proceedings and police investigations were undertaken. Am. Ans. ¶¶ 217 – 222.

The second element is also satisfied, as Copper Bricks alleges the criminal complaint was "entirely devoid of merit" and used "for the collateral purposes of obtaining perjured testimony from key witnesses in this action[.]" *Id*. ¶ 219.

"The gist of the action for abuse of process lies in the improper use of process after it is issued. To show that regularly issued process was perverted to the accomplishment of an improper purpose is enough." *Dean v. Kochendorfer*, 237 N.Y. 384, 390 (1924). Misusing the criminal justice system abroad to coerce and intimidate witnesses domestically certainly fits the description.

Sharestates argues the amendment it futile because it had a legitimate purpose to pursue criminal charges in India to investigate embezzlement. True, where "process has a legitimate purpose, the allegation that it was misused does not suffice to state a claim for abuse of process." *Gidumal v. Cagney*, 144 A.D.3d 550, 552 (1st Dep't 2016) (citations and quotations omitted). A proposed amendment, however, is futile where it would not survive Rule 12(b)(6) scrutiny. *Lucente*

*v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). On a 12(b)(6) motion, the Court must accept all factual allegations as true and construe ambiguities in the plaintiff's favor. *Starr ex rel. Est. of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (citation and quotations omitted).

Here, Copper Bricks claims the criminal proceedings in India were meritless, filed only to obtain advantage to this dispute. Am. Ans. ¶ 219 – 221. And at this stage of litigation, we presume the allegations are true. The second element is satisfied.

The third element is also satisfied, as Copper Bricks alleges the criminal complaint was filed to obtain perjured testimony. Am. Ans. ¶¶ 217 – 220. While Sharestates argues Copper Bricks offers nothing more than threadbare conclusions of law, seven affidavits speak to the contrary. And the allegations provided—if true—are alarming.

Prasad Gopalan is the Co-founder and Chief Operation Office of TechMaven IT Solutions—one of the Indian-based technology consultant firms Sharestates used. *See* Ex. A ("Gopalan Aff.") ¶ 1 – 3, ECF No. 132-3[3]. Gopalan testified Doshi and Davoodi contacted him and bribed him to obtain testimony. *Id.* ¶ 11. They later threatened to file a police report in India if Gopalan did not sign a false affidavit. *Id.* ¶ 12. After Gopalan refused, Doshi and Davoodi contacted his former employees posing as recruiters and proposed the same offer—money and employment in exchange for a favorable, allegedly false, affidavit. *Id.* ¶ 13. Doshi and Davoodi eventually followed through, filing a criminal complaint against Gopalan and his former employees. *Id.* ¶ 14.

[3] All affidavits provided by Copper Bricks are located at ECF No. 132-3. They are listed as Exhibits A through G.

Gopalan provided a second affidavit in December 2024 with even more egregious accusations. *See* Ex. C ("Gopalan Aff. Two"). There, Gopalan claims Doshi and Davoodi hired people in India to stalk and harass him, his family, and business associates. *Id.* ¶ 18. The worst instance of harassment was in August 2024, when a person went to Gopalan's home while he was away and blackmailed his wife, stating Gopalan would be in danger if he did not cooperate, and they could withdraw the criminal accusations if he did. *Id.* ¶ 19.

Nisaridas Veeracheray provides similar testimony. *See* Ex. B ("Veeracheray Aff."). Veeracheray was a TechMaven consultant. *Id.* ¶¶ 1 – 4. Veeracheray testifies Doshi first contacted him recruiting for potential Sharestates' consultants. *Id.* ¶ 5 – 6. Doshi eventually offered him money to sign a sworn affidavit on Sharestates' behalf. *Id.* ¶¶ 8 – 9. After Veeracheray refused, Doshi and Davoodi threatened they would "make [his] life miserable by filing cases against [him]." *Id.* ¶ 10.[4] Sharestates representatives also called Veeracheray's employer, informing them he was involved in a criminal proceeding. *Id.* ¶ 10. Veeracheray was eventually summoned to the Hyderabad Police station in June 2024. *Id.* ¶ 11. On the same day he was scheduled to give a statement, a Sharestates representative called and told him the criminal investigation could be withdrawn if he signed the affidavit. *Id.*

Veeracheray also provided a second affidavit. *See* Ex. D ("Veeracheray Aff. Two"). There, Veeracheray states Doshi and Davoodi followed through on their threat and filed a criminal complaint against him. *Id.* ¶ 5. Veeracheray was again summoned to the Hyderabad police station to give a statement on August 20, 2024. *Id.* ¶ 9. Veeracheray claims a woman and a man matching the description of the man who threatened Gopalan's wife went to his home on August 16, 2024,

[4] The Veerachery affidavit incorrectly has two paragraphs numbered 10. This quote refers to the first, and the following sentence refers to the second.

claiming Doshi could withdraw the criminal complaint if he cooperated. *Id.* ¶ 10. When Veeracheray refused, the man threatened to "destroy" him if he spoke to the police about them. *Id.*

Without belaboring the point, Copper Bricks provides three additional affidavits containing similar accusations. *See* Exs. E, F, & G. In sum, Maddali offers far more than threadbare accusations of wrongdoing; he provides seven affidavits of former Sharestates consultants who claim they were threatened, harassed, stalked, and bribed.

Sharestates claims Judge Brown "summarily rejected" the above affidavits, but this argument is—at best—disingenuous. *See* Sharestates' Opposition, ("Oppo.") at 10, ECF No. 132-6. In May 2024, Judge Brown had a TRO hearing where Sharestates sought to freeze Copper Bricks' and Maddali's bank accounts. *See* May 2024 TRO Transcript ("TRO Transcript"), ECF No. 46. Submitted with the TRO were WhatsApp messages where Doshi offered to pay witnesses to sign affidavits and pursue legal action in India if they did not. *See* ECF No. 38-10.

Later, Copper Bricks moved for emergency sanctions to dismiss Sharestates' complaint in its entirety and enter default in Copper Bricks' favor based on the above allegations of witness intimidation. *See* ECF No. 94. Included in that motion were affidavits attached to the Amended Complaint before this Court. *See* ECF No. 94, Exs. A – D. Judge Brown ultimately denied Copper Bricks' motion, *see* 2/24/2025 Docket Order, but this says nothing of the veracity of the affidavits.

To be sure, Judge Brown expressed his bewilderment during the TRO hearing. After reviewing the notably suspicious WhatsApp messages, Judge Brown claimed it was "the worst thing [he's] ever heard in a civil case." TRO Transcript 10:8 – 9. Doshi attempted to explain the WhatsApp messages, and with a hint of sarcasm, Judge Brown asked "do I look like I just fell off a turnip truck? . . . [d]o I look like the dumbest guy you ever met?" *Id.* 24:9 – 13. Judge Brown continued, "[y]ou offer them a job, you offer them money, and now you're threatening them. That's

what it looks like to me." 24:16 – 18. In sum, denying a motion requesting default against an active litigant is a far cry from summarily rejecting affidavits attached in support thereto.

"The crux of a malicious abuse of process claim is the collateral objective element." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009). That is, the plaintiff cannot assert ill intent was a mere motivating factor of the prosecution but must allege the defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003). The plaintiff must allege the defendant "had an ulterior *purpose* or *objective* in facilitating his prosecution." *Id.* at 78 (emphasis in original). Copper Bricks has demonstrated as much to this Court.

c. *Tortious Interference*

Tortious interference has four elements: "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

Each element is pled here. First, Copper Bricks alleges it had a business relationship with two separate entities: SS Infrastructure Development Consultants Limited and Sreekanth & Associates. Am. Ans. ¶¶ 195, 206. Second, "Sharestates, Shayanfekr, and Doshi conspired to interfere with Copper Bricks' existing and potential business relationships through the use of threats, bribery, and other improper means intended to destroy Mr. Maddali and Copper Bricks." *Id.* ¶ 194; *see also id.* ¶ 198 ("Shayanfekr and Doshi had tracked down SS Infrastructure's principals, attempted to bribe them, and then threatened them with retaliation if they entered into any new agreements with Mr. Maddali or Copper Bricks."). Third, Copper Bricks alleges Shayanfekr, Davoodi, and Doshi contacted its business associates for the improper purpose of

interfering with its contracts. *Id*. ¶ 206. Copper Bricks also alleges Shayanfekr, Davoodi, and Doshi used improper means by providing false information or threatening and bribing potential clients. *Id*. ¶¶ 198, 202 – 203. Fourth, Copper Bricks and Maddali were allegedly injured by the loss of contracts with potential business partners. *Id*. ¶¶ 214 – 215. Copper Bricks estimates its damages in the millions of dollars. *Id*. ¶¶ 202, 204. Accordingly, all elements are pled.

Sharestates' opposition in chief is that Copper Bricks states allegations in a conclusory manner and fails to identify specific business relationships that were harmed. I disagree.

Sharestates cites *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, 1996 WL 363091 (S.D.N.Y. July 1, 1996). There, the court dismissed tortious interference where the plaintiff "fail[ed] to identify a specific contract or business relationship[.]" *Id*. at *14. Conversely, Copper Bricks identifies two separate business relationships and several contracts. Am. Ans. ¶¶ 195 – 216.

Sharestates also relies on *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, where the plaintiff had an "opportunity and expectation of entering into an agreement[.]" 356 F. Supp. 3d 379, 405 (S.D.N.Y. 2019). The court held the allegation fell short of claiming the plaintiff *would have* entered an agreement absent the defendant's interference. *Id*. That is, the plaintiff failed to bridge the causal gap between the defendant's interference and the materialized loss of the opportunity.

Here, however, Copper Bricks makes acute assertions that "Singareni declined to award the contract to Copper Bricks *because* of the false criminal complaints" and that "[t]he loss of the Singareni contract was a *direct and proximate result of the interference* by Sharestates, Shayanfekr, Davoodi, and Doshi[.]" Am. Ans. ¶¶ 214 – 215 (emphasis added). Copper Bricks pleads more than mere opportunity and expectation.

This case is more analogous to *Esbin & Alter, LLP v. Zappier*, 2011 WL 940228 (S.D.N.Y. Mar. 17, 2011). In a dispute between two software companies, the defendant brought counterclaims

for tortious interference, alleging the plaintiff contacted the defendant's business associates, falsely accusing the defendant of stealing the plaintiff's software. *Id.* at * 4. As a result, ongoing negotiations between the defendant and several potential clients came to a halt. The court ultimately found the claims were sufficient to survive dismissal. Similarly, Copper Bricks claims SS Infrastructures became unresponsive during negotiations, and it lost a contract bid with Singareni Mines as a result of Sharestates' interference. Am. Ans. ¶¶ 196 – 198, 204, 201 – 214.

Even more like this dispute is *Telecom Bus. Sol., LLC v. Terra Towers Corp.*, 2025 WL 2044198 (S.D.N.Y. July 21, 2025). There, the court specifically noted the plaintiff may pursue tortious interference where the defendant had filed false criminal claims against the plaintiff in Guatemala and El Salvadore, leading to the arrest and incarceration of the plaintiff's CEO. *Id.* at *7. We need not rehash the accusations regarding criminal claims in India but note the parallels to the present dispute. *See supra*.

d. *Prejudice*

Sharestates' only assertion regarding prejudice is "the significant expense and time that would be needed for discovery." Oppo. at 6. But "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *U.S. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989); *see also Bernhard v. Cent. Parking Sys. of N.Y., Inc.*, 282 F.R.D. 284, 291 (E.D.N.Y. 2012). Without more, Sharestates' discovery burden does not defeat the liberal amendment standard imposed by the Federal Rules.

**II. New Parties**

As stated, motions to add new parties and motions to amend are governed by the same standard. *See Amaya*, 285 F.R.D. at 253. That standard also applies to parties added for claims occurring after the complaint is filed. *See Escoffier v. City of N.Y.*, 2017 WL 65322, at *2 (S.D.N.Y.

Jan. 4, 2017) (holding Ruel 15(d) and Rule 21 are afforded the same standard as they "invoke principles of justice"). Here, Doshi and Davoodi are central figures in the new claims. Indeed, they are alleged to have orchestrated the tortious interference and abuse of process in India. Accordingly, their addition is appropriate under Rule 21.

As a final point of note, the above allegations are just that: allegations. And on a motion to amend, we presume the allegations are true. *See Arnold v. Rsch. Found. for State Univ. of New York*, 216 F. Supp. 3d 275, 284 (E.D.N.Y. 2016). While the motion is granted, such says nothing of the truth of the pleadings. Indeed, Doshi and Davoodi will have full occasion to rebut and refute these assertions.

## CONCLUSION

For the foregoing reasons, the motion to amend is GRANTED.

"[T]he weight of authority in this Circuit . . . indicate that motions to amend are non-dispositive." *Getman v. Vondracek*, 731 F. Supp. 3d 524, 528 (W.D.N.Y. 2024) (citations and quotations omitted); *see Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) ("As a matter of case management, a district judge may refer nondispositive motions, such as a motion to amend the complaint, to a magistrate judge for decision without the parties' consent."). "This Court is of the view that a grant of a motion for leave to amend is nondispositive." *Partminer Info. Servs., Inc. v. Avnet, Inc.*, 2009 WL 111958, *1 (S.D.N.Y. Apr. 21, 2009). As such, should either Party choose to challenge this Order, the appropriate standard is clearly erroneous.

**SO ORDERED.**

/s/

Steven Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Central Islip, New York
August 17, 2026